IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **FATHOM EXPLORATION, L.L.C.,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**THE UNIDENTIFIED SHIPWRECKED** )<br>**VESSEL OR VESSELS, etc.,** *in rem***,** )<br>)<br>**Defendants.** ) | **CIVIL ACTION 04-0685-WS-M** |

**ORDER**

This matter comes before the Court on the parties' briefing (docs. 200, 201, 204, 205) concerning the identity of a vessel located in the admiralty arrest area established in 2004 and known as "Shipwreck #1."

**I.    Relevant Background.**

This musty and barnacled action dates back to October 2004, when plaintiff Fathom Exploration, LLC ("Fathom") filed a Complaint against certain *in rem* defendants, consisting of what it believed to be multiple shipwreck sites located near the mouth of Mobile Bay in the territorial waters of the State of Alabama. Fathom's Amended Complaint (doc. 38) asserted causes of action for possession and ownership of artifacts that it may salvage from the wreck sites, pursuant to the law of finds; for a salvage award for services it provides in rescuing artifacts from those sites; and for an injunction prohibiting rival salvors from conducting search or salvage operations within a two-nautical-mile radius of the specified coordinates. On October 27, 2004, the undersigned signed a Warrant of Arrest (doc. 4) for the suspected shipwrecks and ordered Fathom to post process upon the vessels in a conspicuous manner, thereby creating an arrest area encompassing the coordinates where the wreck sites are located.[1]

---

[1]   The court file reflects that on February 15, 2005, Fathom sealed the arrest pleadings in a tube attached to a steel screw-type earth anchor by a one-foot stainless steel cable, and screwed the marker into the sea floor at the center of the arrest area. (*See* doc. 75.)

Several entities filed verified statements of right or interest in the subject wreck sites, including the United States (which claims title and ownership to those vessels insofar as any of them are Civil War-era warships), the State of Alabama (which claims title to those vessels as cultural resources lying in Alabama state waters, pursuant to the Abandoned Shipwreck Act, 43 U.S.C. §§ 2101 *et seq.*, and the Alabama Underwater Cultural Resources Act, Ala. Code §§ 41-9-291 *et seq.*), and the putative Class of Claimants of Clipper Ship ROBERT H. DIXEY (the "DIXEY Claimants") (who claim that one of the shipwrecks is the Clipper Ship ROBERT H. DIXEY, as to the last owners and captain of which they purport to be a class of all descendants, heirs, legatees, distributees and assigns).[2]  A veritable tidal wave of motion practice ensued, only to be halted in December 2005 upon the parties' joint request for entry of a stay to afford a reasonable opportunity for identification of the shipwrecks at issue, on the theory that such identification might eliminate or at least streamline this dispute.  This litigation has remained stayed since that time.  Year after year has passed with no material change in status, as plaintiff battles uncooperative weather conditions and an array of natural and man-made disasters in attempting to discern which vessels, exactly, lie on the sea floor within the arrest area.

On July 1, 2011, the undersigned entered an Order (doc. 195) lifting the stay only as to the singular wreck site identified in the court file as "Shipwreck #1."  In June 2011, based on its archival research and artifacts collected from the site, Fathom announced its "considered identification" of Shipwreck #1 as being the British Barque AMSTEL.  (*See* doc. 193.)[3]  The State of Alabama shares that opinion.  (*See* doc. 194, at ¶ 5.)  However, the DIXEY Claimants dispute that considered identification, and contend that Shipwreck #1 is actually the remains of the ROBERT H. DIXEY.  (*See id.*)  No one has discovered "smoking gun" evidence to prove definitively which vessel it is.  No direct proof has been found (or is likely ever to be found) carved into a beam, fitting, equipment, dishes, or bell that unequivocally reveals the vessel to be

---

[2] The named representative of the DIXEY Claimants is L. Tracy Girdler, who holds himself out as a descendent of Captain Richard Dixey, the Master of the ROBERT H. DIXEY at the time of her destruction in Mobile Bay.

[3] According to the *Collins English Dictionary – Complete and Unabridged* (2003 ed.), a "Barque" (otherwise known as a "Bark") is "a sailing ship of three or more masts having the foremasts rigged square and the aftermast rigged fore-and-aft."  Evidently, the wooden three-masted barque was the most common type of deepwater cargo carrier in the mid-19th century.

one or the other. Rather, to resolve the dispute as to the identity of Shipwreck #1, the parties requested leave to submit written evidentiary submissions and briefs (relying primarily on historical materials and circumstantial evidence) and to have this Court "decide any and all fact issues and resolve any competing inferences based on the available record." (*Id.*, ¶ 7.) Via the July 1 Order, the undersigned adopted the parties' proposal. After a modest discovery period, Fathom and the DIXEY Claimants submitted memoranda and exhibits setting forth the facts and circumstances underpinning their respective identification views. The Court has carefully reviewed and considered those materials, and appreciates both sides' painstaking efforts to research the DIXEY and AMSTEL wrecks. Without such labors, even provisional identification of Shipwreck #1 would be a hopeless endeavor.[4]

## II.     Findings of Fact and Conclusions of Law.

### A.     *Historical Facts Relating to the ROBERT H. DIXEY.*

Just sit right back and you'll hear a tale, a tale of a fateful trip. It did not start in a tropic port, nor aboard a tiny ship. On August 15, 1860, the Clipper Ship ROBERT H. DIXEY set sail that day from New York to Mobile, carrying a cargo described only as "miscellaneous

---

[4] This procedural posture is highly unusual. For starters, the proper identity of Shipwreck #1 is a matter better suited for spirited scholarly discourse than black-letter judicial construction. Yet the parties have submitted their dispute to a federal judge, not a 19th century maritime historian. Furthermore, while both sides agree that 100% certainty as to the vessel's identity is not possible, resolution of this factual issue does not turn on the sort of credibility determinations for which an evidentiary hearing would be appropriate. The underlying events having taken place a century and a half ago, there are no live witnesses to recount the circumstances under which the DIXEY and the AMSTEL sank. Nor are there dueling expert witnesses whose theories might be poked and prodded via cross-examination. Instead, as the DIXEY Claimants succinctly state, "[t]here is what there is." (Doc. 201, at 8.) What each party has presented is a limited historical record, pieced together after untold hours of laborious research, yielding inferences that Shipwreck #1 is one or the other of these vessels. The Court has assented to the role of fact-finder, evaluating those competing inferences, only because the parties have requested that it do so and because it appears to be the only practicable means of resolving the parties' disagreement over the ship's identity. *See* doc. 201, at 1 ("The vessel identity issue needs to be decided by the Court. … [T]hese claimants are content to have the court decide the vessel identity question based on the submissions and, these claimants agree – we think we all agree – that any conflicting facts and competing inferences be resolved by the Court as factfinder."). And of course, the identity of Shipwreck #1 is of vital importance to the parties' underlying claims and rights in this matter, including Fathom's contentions that it is entitled to possession or a salvage award for Shipwreck #1, and the claimants' potential rights and interests in Shipwreck #1.

hardware." (Doc. 200, Exh. 3, at 150-51.) The DIXEY reached an anchorage in Mobile Bay on the evening of September 14, 1860. (*Id.* at 151.) By inopportune coincidence, the DIXEY arrived at the Bay just hours ahead of a Category 1 hurricane. (Doc. 200, Exh. 1 at 1; Exh 3, at 151.) Wary of the approaching storm, Captain Dixey (by all accounts a skipper brave and sure) put out "double anchors and all chain" at 10 p.m., and took "all measures to ride out a storm." (Doc. 200, Exh. 3, at 151.)

The precise location of this anchorage is of some significance. The historical documents do not reveal exact coordinates; however, a newspaper account published in *The Daily Picayune* on September 20, 1860, provided helpful detail.[5] According to this article, the DIXEY "sailed inside of the bar" on September 14 and put out anchors "at about half way between the bar and Choctaw light." (Doc. 200, Exh. 2, at 2.) The "bar" appears to be a reference to the outer Mobile bar offshore of Fort Morgan, some 35 miles from Mobile.[6] Meanwhile, "Choctaw light" is described in the literature as a light "established at the head of the bay at Choctaw Point" in 1831 for the purpose of "aid[ing] vessels across Dog River bar at the city of Mobile." (Doc. 200, Exh. 12.) If Choctaw light was at one end of Mobile Bay, and the "bar" was at the other, and if the DIXEY anchored halfway between the two on the evening of September 14, then the DIXEY stopped approximately 17 miles from the mouth of Mobile Bay.[7]

The hurricane struck at approximately 2:00 a.m. on September 15, 1860. The DIXEY actually weathered the first few hours of the storm well. With the winds out of the south, the DIXEY was sheltered by the buffering presence of Dauphin Island (to the vessel's south) from the worst of the rough seas, at least initially. After 8:00 a.m, however, the eye of the hurricane passed, and fierce winds shifted to the north. The weather started getting rough, and the mighty ship was tossed. In its anchored position, the DIXEY was exposed to approximately 17 miles of

---

[5] *The Daily Picayune* identified as its source Samuel Smyly, an experienced Mobile bar pilot who had been a passenger onboard the DIXEY for the voyage from New York to Mobile. (Doc. 200, Exh. 2, at 2.)

[6] "Mobile Bay is a roughly rectangular body of water that extends about thirty-five miles from its entrance to the city of Mobile at its head." (Doc. 200, Exh. 12.)

[7] This determination is consistent with the diagram prepared by the DIXEY Claimants' named representative, L. Tracy Girdler, and labeled "The End of the *Dixey*" on page 152 of his book, *An Antebellum Life at Sea*. (Doc. 200, Exh. 3, at 152.)

open shallow water stretching all the way to Mobile.  As a result, the DIXEY was pounded by the punishing winds and roiling seas.  (Doc. 200, Exh. 3, at 151.)  The first anchor's chain broke at around 10:00 a.m.  The DIXEY's crew began working feverishly to cut away its masts and sails, thereby lightening the ship and reducing its wind exposure, even as the DIXEY took on water for over an hour.  (Doc. 200, Exh. 2, at 2-3.)  If not for the courage of the fearless crew, the DIXEY would have been lost.  Alas, the gale continued to worsen and the other anchor chain snapped, causing the DIXEY to be buffeted by the hurricane, tossed around in the shallow water like a child's toy.  (*Id.*)  The wind and seas pushed the helpless DIXEY south down the shipping channel of Mobile Bay for some 12 miles.  (Doc. 200, Exh. 3, at 151.)  At approximately 11:00 a.m., the fatal blow was struck when the DIXEY smashed against the shoals of the west bank, breaking her ribs and keel.  (*Id.* at 151-52.)  Yet the mortally wounded vessel continued to "bounce[] down the channel," drifting slightly to the east, "and everything was going to pieces."  (*Id.* at 152; doc. 200, Exh. 2, at 3.)  In a last-ditch attempt to survive, Captain Dixey and 18 Bahamian crewmen who could not swim lashed themselves to what was left of the rigging.  (Doc. 200, Exh. 3, at 151.)[8]  At around noon, the DIXEY struck a land mass known as East Bank on the east side of the shipping channel, roughly 2 to 3 miles southeast of the initial collision.  "In the very shallow water that lay to the east of the main ship channel, the *Dixey* was soon pounded to pieces."  (*Id.* at 151.)[9]  "By midafternoon on Saturday, September 15, 1860, all that was left of the *Dixey* was floating back in the bay."  (*Id.* at 153.)

The postscript to this story is that for more than a century, Mobile mariners have taken to calling East Bank (where the DIXEY sank) "Dixey Bar," in honor and remembrance of that

---

[8] Sam Smyly (the bar pilot) and five others lashed themselves to a loose yard on the bow and jumped clear of the ship.  (*Id.* at 153.)  These six were the only survivors from the DIXEY, as the other 19 (including Captain Dixey) perished in the storm.  (*Id.*)  The six survivors were rescued at approximately 1 p.m. by a boat launched by the Liverpool packet AMERICAN UNION, whose officers used telescopes to observe the DIXEY's unfolding calamity from the relative safety of an anchorage two miles to the east in 40 feet of water on the south side of Fort Morgan, which protected the AMERICAN UNION from the merciless beating from the north that demolished the DIXEY.  (*Id.* at 152-53.)

[9] Girdley's colorful depiction of these horrific events was that "the breaking of her ribs was like the unraveling of a sweater.  Each breaker loosened some more planks, the deck and rails came apart, and the timbers to which the rigging was fastened broke away.  The men tied to these shrouds and stays were tossed like rats in a trap.  Nothing could be done."  (*Id.*)

vessel's tragic end. In July 2005, the U.S. Board on Geographic Names formally approved the name change of that uncharted desert isle to Dixey Bar. (Doc. 200, Exhs. 4, 5.) It is undisputed by the parties that Dixey Bar marks the spot where the ROBERT H. DIXEY met its demise.

### B.     *Historical Facts Relating to the AMSTEL.*

Part two of our nautical tale concerns the fate of the British Barque AMSTEL. The loss of the AMSTEL was quite similar from a temporal and geographic perspective to that of the DIXEY, yet strikingly different in other particulars.

The AMSTEL's story began in 1842, when the ship was built in the Netherlands for the Boissevain Company, a large shipping concern based in Amsterdam. (Doc. 200, Exh. 13.) Apparently, the AMSTEL was sold to an English company in 1860. (*Id.*) What happened next is murky, but what is known is that a ship reported as being the AMSTEL ran aground near the mouth of Mobile Bay in late May or early June of 1861.

These were tumultuous times. The Union had newly established a blockade of Mobile, with the U.S.S. Niagara (a 12-gun screw steamer boasting a crew of nearly 400) taking anchor "off Mobile" on May 29, 1861. (Doc. 200, Exhs. 6 & 7.)[10] The Niagara's captain, William W. McKean, wrote the following in his log on June 5, 1861: "[O]bserving operations of a suspicious character going on on board of a hulk lying between Dauphin and Sand Islands, and that communication was taking place with a schooner anchored near her." (Doc. 200, Exh. 7, at 2.) Captain McKean sent several blockade vessels, among them the U.S.S. Mount Vernon (a smaller 3-gun screw steamer with a crew numbering only 50), "to examine the hulk and cut out the schooner." (*Id.* & Exh. 6.)[11] In a report to the Secretary of the Navy dated June 6, 1861, Captain McKean elaborated on this incident as follows: "A schooner, supposed to be armed, and having a number of men on her deck, has been seen for a number of days past beating about the harbor of

---

[10]     Internet sources indicate that the U.S.S. Niagara had only recently been pressed into duty in a Union blockade role, as the steamer had returned from a special assignment transporting Japan's first diplomatic mission home to Tokyo Bay just weeks before the events described herein.

[11]     The Mount Vernon was as new to the blockade business as the Niagara. Published reports suggest that the U.S. Navy first chartered the Mount Vernon for a three-month period beginning in May 1861. It appears that the Mount Vernon convoyed to the Gulf of Mexico with the Niagara and two other vessels at that time.

Mobile, just within the bar.  Yesterday morning she was discovered becalmed alongside the wreck of a large ship, with a number of hands apparently engaged in dismantling her." (Doc. 200, Exh. 7, at 5.)  Captain McKean reported that blockade vessels seized possession of the schooner that afternoon, and described the schooner as "a strong-built and well-found vessel of about 100 tons, called the Aid, and belongs to Mobile." (*Id.*)  According to his letter, Captain McKean's plans for the AID were to mount a "24-pounder howitzer upon her … and to employ her to aid in the blockade until the arrival of the flag-officer." (*Id.*)[12]

Four key questions emerge from this narrative, all of which Fathom has endeavored to answer with a combination of facts and inferences.  First, how do we know that the "wreck of a large ship" or the "hulk" described by Captain McKean was the AMSTEL?  His logs and reports do not name that vessel.  However, on June 7, 1861, the *Mobile Register and Advertiser* ran an item with the headline "Schooner Captured by the Blockading Fleet."  That article states that "[t]he schooner Aid, belonging to Peter Rosenkrantz, hired by Mr. John Scott **to strip the British bark Amstel,** has been captured by the blockading fleet."  (Doc. 200, Exh. 10 (emphasis added).)  While not corroborated by other sources in the record, this positive contemporaneous identification strongly suggests that the vessel on which the AID was performing salvage operations at the time of its capture was, indeed, the AMSTEL.

Second, how did the AMSTEL get there?  That is not so clear.  The Union captain refers to it as a "hulk" or a "wreck" but does not elaborate on its condition.  Fortunately for history, there is a lithograph contained in the record and captioned "Cutting out of the Southern schooner 'AID,' off Mobile, by the Boats of the U.S. Steam Frigate Niagara, Assisted by the U.S. Steamer Mount Vernon, June 5, 1861. – from a sketch by an officer of the expedition."  (Doc. 200, Exh. 8.)  This image appears to depict Union boats approaching the AID as it sits alongside the AMSTEL.  The AMSTEL is tilted at an angle and of course its masts are bare, but the barque does not appear to have sunk, capsized or sustained heavy damage.  To the contrary, the AMSTEL looks to be intact and mostly upright.  Given how high out of the water the vessel sits, it appears likely that the AMSTEL had simply run aground.  From this lithograph, Fathom

---

[12]  A newspaper report in the *Daily Picayune* on July 6, 1861 confirms that the Union did, in fact, utilize the AID for this purpose.  Indeed, the article describes the exploits of "a craft, supposed to be the captured schooner Aid," in disrupting and capturing commercial shipping business in the weeks that followed.  (Doc. 200, Exh. 9.)

reasonably hypothesizes that the AMSTEL ran hard aground on a shallow sandbar, perhaps because of piloting error or strong currents. (*See* doc. 193, ¶ 11.) This is a very different scenario from the prolonged violent thrashing that smashed the ROBERT H. DIXEY to pieces on East Bank nine months earlier. Whereas the DIXEY was pounded to bits by hurricane-force winds and raging waters, the AMSTEL simply got stuck on a sandbar and could not move.

Third, given this theory for how the AMSTEL got there, it bears asking: Where exactly is "there"? Again, the record does not conclusively answer this question; however, several clues are present. For example, Captain McKean's log describes the stranded vessel as "lying between Dauphin and Sand Islands," and his report to the Secretary of the Navy places the schooner AID at a location "beating about the harbor of Mobile, just within the bar." (Doc. 200, Exh. 7, at 2, 5.) The lithograph orients the AMSTEL just to the left of what appears to be the Sand Island Lighthouse and much further to the left of Fort Morgan. Those depictions are at least plausibly consistent with Fathom's notion that the AMSTEL ran hard aground on what is known as the Southwest Spit, south of the Sand Island lighthouse and significantly south and west of Fort Morgan, and not far inside the outer bar at the entrance of Mobile Bay. (*See* doc. 206.)

Fourth, what became of the AMSTEL after the June 5, 1861 incident culminating in the capture of the AID? Here, history's trail has gone cold. Fathom identifies nothing in the historical record that would provide insight into the ultimate fate of the AMSTEL after the AID's failed attempt to salvage/strip its cargo. Fathom's hypothesis – and it is nothing more – is that, after the AID's capture, no other schooner or vessel dared approach the AMSTEL for fear of being picked off by the Union blockade. And, Fathom postulates, the Union had no interest in the AMSTEL or its cargo. If that were the case, then, the AMSTEL simply sat abandoned on the Southwest Spit for years, slowly disintegrating until the sea reclaimed ship and cargo alike as the barque disappeared beneath the waters.[13]

---

[13]  To rebut the notion that frequent coastal storms would have dislodged or smashed the AMSTEL long before this degenerative process concluded, Fathom points to weather data showing that between October 1860 and August 1865 there was no hurricane activity along the Gulf Coast (northwest Florida, Alabama, Mississippi, Louisiana, Texas). (*See* doc. 200, Exh. 1.) On that basis, plaintiff reasons that it is possible that the AMSTEL could simply have sat where it ran aground for a period of years until the hull, ribs and decks rotted into the sea. Perhaps, but given the notorious volatility of Gulf Coast weather patterns, it seems a stretch to infer from the
(Continued)

-8-

### C. *Shipwreck #1 is Consistent with the AMSTEL Facts, Not the DIXEY Facts.*

The question presented to the Court in the parties' memoranda is which of these historical narratives can best be reconciled with known facts concerning Shipwreck #1. Fathom argues that Shipwreck #1 is the AMSTEL, while the DIXEY Claimants assert that it is the DIXEY.

For two principal reasons, the Court is of the opinion that Shipwreck #1 is not, and cannot be, the remains of the ROBERT H. DIXEY. First and foremost, the location of Shipwreck #1 diverges too greatly from the known spot where the DIXEY went down. The historical record leaves no doubt that the DIXEY sank at what is now known as Dixey Bar. In the DIXEY Claimants' own words, "History is clear that the ROBERT H. DIXEY sank in 1860 right there on or around what is now named Dixey Bar." (Doc. 201, at 3.)[14] But Shipwreck #1 is <u>not</u> located at Dixey Bar. All information before the Court at this time – including maps and charts submitted by Fathom showing the coordinates of Shipwreck #1 as compared with Dixey Bar's coordinates on file with the U.S. Geographic Names Information System – is that Shipwreck #1 is positioned more than 2 miles southwest of Dixey Bar. (Docs. 202, 206; doc. 201, Exh. 5.) In fact, the coordinates of Dixey Bar are outside the areas for which Fathom has received permits from the Alabama Historical Commission for maritime exploration and evaluation. (Doc. 207.) So the record is clear that Shipwreck #1 is not located at Dixey Bar, where the ROBERT H. DIXEY is known to have sunk, but is instead more than two miles away. The DIXEY Claimants do not suggest that the DIXEY wreckage might have migrated that kind of distance along the sea floor in the intervening 150 years; to the contrary, they acknowledge that "[t]here is no suggestion anywhere that anybody has moved it since then." (Doc. 201, at 3.) If Shipwreck #1 is not reasonably near the known location where the ROBERT H. DIXEY sank in September 1860, and if there is no reason to think the DIXEY could have moved that far after it sank, then Shipwreck #1 cannot be the DIXEY.

---

absence of hurricanes that there were no strong storms in Mobile Bay during that lengthy period capable of dislodging or destroying the AMSTEL.

[14] The DIXEY Claimants reinforce the point by reasoning that "the South Alabama community has very, very long recognized the bar south of Fort Morgan as 'DIXEY Bar,' and that is admissible evidence that the South Alabama community long ago decided that 'Dixey Bar' is where the ROBERT H. DIXEY sank and, a reasonable person could reasonably infer, is still there." (*Id.* at 5.)

The second insuperable obstacle to the DIXEY Claimants' attempt to identify Shipwreck #1 as the DIXEY concerns the condition of the cargo.  A prominent, documented feature of Shipwreck #1 is that the bulk of the cargo is found in a single tight grouping on the sea floor, measuring approximately 110 feet long and 25 feet wide.  In that grouping are stud link chain, two separate piles of neatly stacked barrels, stone slabs stacked on edge, railroad axles, ballast stone and a bell.  (Doc. 200, Exh. 11.)  A diagram of the wreck site prepared by Fathom is remarkable in its depiction of organized, stacked cargo, sorted and grouped by category of item, and apparently (other than the bell) untouched since the sinking of whatever vessel carried it.[15]  It defies logic and common sense that the ROBERT H. DIXEY's cargo could exist in such a form.  Recall that the DIXEY was beaten, battered and systematically "unraveled like a sweater" by hurricane winds and waters in the Mobile Bay shipping channel for a three-hour tour of terror, in a harrowing 14-mile journey in which she careened into the banks of the channel, repeatedly striking bottom in the shallow waters as she went, before ultimately getting pounded to pieces by the hurricane at Dixey Bar.  Such an event is not conducive to the kind of compact, stacked, sorted and organized cargo field displayed at Shipwreck #1, and the DIXEY Claimants have no explanation or hypothesis for how the DIXEY's cargo could possibly have come to rest on the sea floor in the configuration depicted in Exhibit 11.

In short, Shipwreck #1 is located in a different area of Mobile Bay than that in which the DIXEY sank, and the cargo array of Shipwreck #1 is drastically different than what the DIXEY's would be expected to be.  For these reasons, the Court finds that Shipwreck #1 is not the ROBERT H. DIXEY.[16]  The DIXEY Claimants therefore have no claim or cause of action concerning same.

---

[15] Fathom's brief is silent as to the circumstances of that diagram's creation, offering no specifics as to who prepared it or when.  At best, plaintiff references the "declaration of David Anderson attached hereto" (doc. 200, at 10), but no such exhibit was appended to Fathom's brief.  Nonetheless, the Court will consider the diagram for purposes of the Shipwreck #1 identification, based on the DIXEY Claimants' statement that "they do not object to the admission into the record of any exhibit filed by the Fathom claimants on the vessel identity issue."  (Doc. 204, at 1.)  Certainly, nothing before the Court would call into question the accuracy and veracity of the wreck cargo diagram found at plaintiff's Exhibit 11.

[16] In so concluding, the Court has given careful consideration to the 31-inch, 700-lb bronze bell recovered from Shipwreck #1.  That bell bears a date of 1860 and appears to have been cast by the Meneely Bell Foundry of West Troy, New York.  (Doc. 193, ¶ 2.)  The DIXEY (Continued)

A different (and more problematic) question than ruling out the ROBERT H. DIXEY is whether the AMSTEL may be affirmatively ruled in as the identity of Shipwreck #1. Undoubtedly, the condition of Shipwreck #1 is consistent with what is known about the fate of the AMSTEL.  The location of the AMSTEL wreck upon running aground at the Southwest Spit appears in close proximity to the site of Shipwreck #1.  If, as is extrapolated from known facts, the AMSTEL were simply allowed to deteriorate and vanish into the sea because no salvor could reach it during the Union blockade, then the unblemished cargo configuration of Shipwreck #1 would be consistent with such a story.  And it is at least possible that the AMSTEL could have been carrying a 700-pound bronze bell forged in New York in 1860 during its last voyage in May 1861.  So certainly, there are signs pointing to the AMSTEL as Shipwreck #1.

If the foregoing sounds like a lukewarm endorsement of Fathom's theory, that's because it is.  The Court understands the monumental challenges the parties have encountered in trying to piece together the stories of these ships dating back one and a half centuries.  As of right now, however, there are too many unanswered questions and too many factual gaps to enable a conclusive identification of Shipwreck #1 as the AMSTEL, particularly given the dozens (hundreds?) of ships known or believed to have sunk in Mobile Bay over the years.  Perhaps the most vexing leap in the narrative is the proposition – devoid of supporting evidence – that the AMSTEL was simply left to rot on the Southwest Spit (a process that must have taken years), despite carrying a valuable cargo and despite apparently not being catastrophically damaged as a seaworthy vessel (*i.e.*, it had not been smashed, it had simply run aground).  The suggestion that no one would have cared enough about the AMSTEL to retrieve her or remove her cargo during

---

Claimants argue that the presence of the bell buttresses their claim that Shipwreck #1 is the ROBERT H. DIXEY, inasmuch as that clipper's journey in August – September 1860 was from New York to Mobile, Alabama.  No cargo manifests or shipping bills have been discovered placing this bell on any specific vessel at any specific time.  We do not know what the DIXEY's cargo was on its final voyage, with Girdley classifying it only in general terms as "miscellaneous hardware."  The mere coincidence of the DIXEY having picked up a load of unknown cargo in New York in 1860, and the presence at Shipwreck #1 of a bell forged in New York in 1860, is not sufficient to overcome the obstacles posed by the geographic disparity between Shipwreck #1's location and the known wreck site of the DIXEY, or the tidy, compact concentration of cargo at Shipwreck #1 as contrasted with the violent end of the DIXEY over a 14-mile stretch of progressive destruction in the Mobile Bay shipping channel.

the period of years that must have been required for her to disintegrate into the sea – even though she would have been readily visible to the blockade, to passing vessels and even to people on land at Fort Morgan or Sand Island – may not be impossible, but it is questionable.  The same goes for the proposition that no strong storms of the kind that are indigenous to the Gulf Coast would have moved the AMSTEL from where she ran aground, and that she instead melted away on the Spit.[17]  With no hard evidence as to what became of the AMSTEL, the guesswork and uncertainty inherent in Fathom's narrative is simply too vast to be accepted as definitive truth.

### D.     *The Path Forward.*

All is not lost.  Plaintiff's filings reflect that its research efforts concerning the AMSTEL persist today.[18]  The Court is optimistic that such activities, pursued diligently, will yield further clues that may bolster or undermine the theory that Shipwreck #1 is, in fact, the Barque AMSTEL.  To that end, plaintiff is **ordered** promptly to notify the Court and all other counsel of record of any material findings (whether through archival research or activities at sea) tending to shed light on the identity of the vessel, irrespective of whether such data points strengthen or weaken the AMSTEL hypothesis.

For now, however, the Court finds that Shipwreck #1 may be provisionally identified as the AMSTEL.  A critical question becomes whether the AMSTEL is abandoned.  The Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101 *et seq.* ("ASA"), provides that the United States asserts title to any abandoned shipwreck that is (i) embedded in a state's submerged lands, (ii) embedded in state-protected coralline formations on the state's submerged lands, or (iii) on the state's submerged lands and included or eligible for inclusion in the National Register.  *See*

---

[17]  Also, if the AMSTEL had rested on the Southwest Spit, within sight of Fort Morgan (as the lithograph depicts) and the Sand Island Lighthouse, for a period of years, tantalizingly within mariners' field of vision but beyond their grasp because of the dastardly Union blockade, surely tales of the elusive and mythical glories of the AMSTEL would have filtered down through the maritime lore, and perhaps even celebrated in song like the S.S. MINNOW.  Yet we have nothing of the sort here.

[18]  In its brief, Fathom writes, "Current research into the AMSTEL is ongoing." (Doc. 200, at 17.)  Likewise, an exhibit prepared by Fathom in January 2012 reflects that "[c]ontinued research into the AMSTEL is ongoing in the Netherlands, England and the US." (Doc. 209, Exh. A, at 1.)  And Fathom's projected activities for 2012 include "Continued archival research into the Barque AMSTEL in England, the Netherlands and the US," as well as "Artifact recovery and continued diver survey work on the AMSTEL."  (*Id.* at 4.)

43 U.S.C. § 2105(a). By operation of the ASA, "[t]he title of the United States to any abandoned shipwreck asserted under subsection (a) of this section is transferred to the State in or on whose submerged lands the shipwreck is located." § 2105(c). Likewise, "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies." 43 U.S.C. § 2106(a). Simply put, "a state acquires title to a shipwreck under the ASA, when the wreck is: (1) abandoned and (2) falls under one of the three enumerated categories. … If title to the [wreck] meets the criteria under the ASA, title vests in the State and no salvage is awarded." *Northeast Research, LLC v. One Shipwrecked Vessel, her Tackle, Equipment, Appurtenances, Cargo*, 790 F. Supp.2d 56, 63 (W.D.N.Y. 2011) (citations omitted); *see also Great Lakes Exploration Group, LLC v. Unidentified Wrecked and (For Salvage-Right Purposes), Abandoned Sailing Vessel*, 522 F.3d 682, 688 (6th Cir. 2008) ("The ASA … overrides the old maritime laws of salvage and find and provides a method for states to assert claims of title to abandoned shipwrecks."). There appears to be no question that Shipwreck #1 falls within one of the three enumerated categories in § 2105(a) in terms of being embedded in the State of Alabama's submerged lands.[19] As such, Fathom's rights to salvage or title of Shipwreck #1 may turn on whether the AMSTEL was abandoned or not.

"[B]ecause there is a presumption against finding abandonment …, the State must prove abandonment by clear and convincing evidence. … [C]ourts consider factors such as lapse of time, the owner's nonuse, the place of the shipwreck, and the actions and conduct of the parties having ownership rights in the vessel." *Northeast Research*, 790 F. Supp.2d at 64-65 (citations omitted); *cf. R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, 435 F.3d 521, 532 (4th Cir. 2006) ("Courts, however, have traditionally presumed that when property is lost at sea, title remains with the true owner, regardless of how much time has passed."); *Sea Hunt, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 641 (4th Cir. 2000) (discussing conditions under which abandonment may be found in shipwreck case). Fathom maintains that "[d]escendants of owners whose property is lost at sea have the right to intervene and claim an ownership interest therein" and advocates that "the heirs of [the AMSTEL's] owners and/or insurers [be given] an opportunity to assert their proprietary interests in the vessel and its cargo."

---

[19] This assumption appears uncontroversial, given the statement in a previous joint filing that "[t]he parties agree that this particular vessel is embedded in the submerged lands of the state of Alabama, within the meaning of The Abandoned Shipwreck Act." (Doc. 194, ¶ 3.)

(Doc. 200, at 20.) But this discussion raises as many questions as it answers. Does the State maintain that Shipwreck #1 is an abandoned shipwreck, thereby transferring title to it under the ASA? Does anyone know (or can anyone find out) who the heirs of the AMSTEL's owners and insurers might be, so as to give them notice and an opportunity to intervene? If the State does claim abandonment, how will it make the requisite showing by clear and convincing evidence? The parties are **ordered** to file a joint status report, on or before **April 9, 2012**, setting forth a joint proposal (or, if they cannot reach one, their competing proposals) for the procedure that should be followed to litigate and resolve the abandonment issue as to Shipwreck #1, given the provisional identification by this Court that it is indeed the AMSTEL.[20] That report also should address the sub-issue of notification of heirs of the AMSTEL's owners and/or insurers.

### III. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. The Court finds that Shipwreck #1 in the admiralty arrest area is not the Clipper Ship ROBERT H. DIXEY and that, consequently, the DIXEY Claimants have no right, claim or interest to that shipwreck site;
2. The Court provisionally finds that Shipwreck #1 is the British Barque AMSTEL;
3. Plaintiff is **ordered** to continue diligently performing the archival research and diving activities described herein pertaining to Shipwreck #1, and promptly to notify the Court and opposing counsel of any material findings tending to shed further light on the identity of the vessel, irrespective of whether such data points strengthen or weaken the AMSTEL hypothesis; and
4. The parties are **ordered** to file a joint status report, on or before **April 9, 2012**, setting forth a joint proposal (or, if they cannot reach one, their competing proposals) for the procedure that should be followed to litigate and resolve the abandonment issue as to Shipwreck #1.

---

[20] The Court is particularly interested in hearing the parties' thoughts as to the nuts and bolts of how they propose to move forward on Fathom's claims concerning Shipwreck #1. Are the parties now prepared to submit briefs on the abandonment issue? Is some time period for discovery (or for identification / notification / consultation with the AMSTEL's descendants) necessary? How long should such a process require and what would it entail?

-15-

DONE and ORDERED this 9th day of March, 2012.

                                                s/ WILLIAM H. STEELE  
                                                CHIEF UNITED STATES DISTRICT JUDGE